IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND


TROY HAMMONS                    *
                                *
v.                              *    Civil Action No. WMN-14-1673
                                *
NVR, INC.                       *

    *    *    *    *    *    *    *    *    *    *    *    *    *    *    *    *

## MEMORANDUM

Before the Court is Defendant's Motion for Summary

Judgment.  ECF No. 40.  The motion is fully briefed.  Upon

review of the motion and the applicable case law, the Court

determines that no hearing is necessary, Local Rule 105.6, and

that the motion should be granted in part and denied in part.

## I. FACTUAL AND PROCEDURAL BACKGROUND

Most of the relevant facts in this action are undisputed.

Briefly summarized here, but presented in more detail below,

those facts are as follows.

Defendant NVR, Inc. is in the business of selling new homes

in various communities throughout the country.  Defendant

contracts with a purchaser and then builds a home to that

customer's specifications.  Plaintiff Troy Hammons was employed

by Defendant as a Sales and Marketing Representative (SMR) from

September 2008 through May 2012, except for a brief period in

2009 in which he was laid off because of the poor real estate

market.  As an SMR, Plaintiff was responsible for both procuring

contracts with customers for the purchase of homes and also for shepherding those contracts through to settlement. Those post-contract/pre-settlement responsibilities included: maintaining contact with the customer, assisting the customer in obtaining financing, monitoring the construction of the home, dealing with any change orders, inspecting the home with the customer to assure it is being built to their specifications, and any other related tasks to ensure that the customer is satisfied and that the contract goes to settlement.

Defendant compensates its SMRs under a commission-based program. See ECF No. 48-3 (copy of SMR Compensation Program dated 2/11/11). Under that Compensation Program, SMRs are paid a commission, typically $5000 per sale, but do not actually earn that commission until the contract has been brought to settlement. Because the period between contracting and settlement can be several months, the compensation program provides for advances to be paid in an amount equal to 50% of the anticipated commission. These advances are in the nature of a loan and must be repaid or used to offset other earned commissions should the contract not go to settlement. Id. at 2.

In the spring of 2012, Plaintiff was successfully selling homes for Defendant in a community known as Ashby Commons in Easton, Maryland. When Defendant was unable to come to an agreement with the developer of that community, it ceased

2

selling homes there and transferred Plaintiff to the closest development to Plaintiff's home, a community in Severn, Maryland, known as Woodberry.[1]  After the transfer to Woodberry, Plaintiff was unable to meet his sales quota and several meetings were held and correspondence generated concerning what his supervisors perceived to be inconsistent performance on the part of Plaintiff.  At one such meeting, Plaintiff made a request for a monthly draw to meet his living expenses.  That request was denied.  Shortly thereafter, on May 18, 2012, Plaintiff sent an email to his division manager, Roy Grant, protesting the criticism of his performance and the denial of the requested draw and indicating that this email was his "written notice of resignation," as of that date.  ECF No. 40-5.

    At the time of his resignation, Plaintiff had several home sales under contract but yet to be brought to settlement.  In his Amended Complaint, Plaintiff identified 11 home sales that were under contract at the time that he resigned.  He also alleged that, to the best of his knowledge, 10 of the 11 went to settlement.  Plaintiff asserts that the unpaid commissions on

---

[1] In his Amended Complaint, ECF No. 18, Plaintiff alleges he was transferred to a community known as Evergreen Commons, also in Anne Arundel County.  Id. ¶ 9.  Plaintiff further alleged that he was transferred to this underperforming community with the goal of forcing him to resign and forfeit his pending commissions.  Id. ¶ 12.  In opposing the motion for summary judgment, Plaintiff makes no further reference to any improper motive associated with the transfer.

these sales are wages due him under the Maryland Wage Payment and Collection Law (MWPCL), Md. Code Ann., Employ. §§ 3-501 et seq.  In addition to separate counts in his Amended Complaint relating to each of these potential commissions (Counts I–XI), Plaintiff brings an additional claim for unjust enrichment related to the work he performed procuring all 11 of those sales (Count XII).[2]  Defendant answered the Amended Complaint and also filed counterclaims for breach of contract (Count I) and unjust enrichment (Count II) to recover the advances paid to Plaintiff for contracts that did not settle until after his resignation. Defendant has now moved for summary judgment in its favor both on Plaintiff's claims and its own counterclaims.

## II. LEGAL STANDARD

"The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a); Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986) (citing predecessor to current Rule 56(a)).  The burden is on the moving party to demonstrate the absence of any genuine dispute of material fact.  Adickes v. S.H. Kress & Co., 398 U.S.

---

[2] Plaintiff's original Complaint was filed in the Circuit Court for Talbot County and contained a single count encompassing the commissions owed on all 11 pending contracts.  ECF No. 2. Defendant removed the case to this Court and the Plaintiff subsequently filed an Amended Complaint bringing a separate MWPCL claim related to each contract and adding the claim for unjust enrichment.

144, 157 (1970).  If sufficient evidence exists for a reasonable jury to render a verdict in favor of the party opposing the motion, then a genuine dispute of material fact is presented and summary judgment should be denied.  See Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986).  However, the "mere existence of a scintilla of evidence in support of the [opposing party's] position" is insufficient to defeat a motion for summary judgment.  Id. at 252.  The facts themselves, and the inferences to be drawn from the underlying facts, must be viewed in the light most favorable to the opposing party, Scott v. Harris, 550 U.S. 372, 378 (2007), who may not rest upon the mere allegations or denials of his pleading but instead must, by affidavit or other evidentiary showing, set out specific facts showing a genuine dispute for trial.  Fed. R. Civ. P. 56(c)(1). Supporting and opposing affidavits are to be made on personal knowledge, contain such facts as would be admissible in evidence, and show affirmatively the competence of the affiant to testify to the matters stated in the affidavit.  Id. 56(c)(4).

## III. DISCUSSION

The MWPCL provides, in pertinent part, that "each employer shall pay an employee or the authorized representative of an employee all wages due for work that the employee performed before the termination of employment, on or before the day on

5

which the employee would have been paid the wages if the employment had not been terminated." Md. Code Ann., Lab. & Empl. § 3-505. "Wages" are defined under the MWPCL as "all compensation that is due to an employee for employment" and are defined so as to include bonuses and commissions. Id. § 3-501(c)(1)&(2). Section 3-507.2(a) provides the employee with a civil cause of action to recover wages withheld in violation of § 3-505. Furthermore, courts have held that an employer cannot contract around the provisions of the MWPCL because "a contract conflicting with public policy set forth in a statute is invalid to the extent of the conflict between the contract and that policy." Medex v. McCabe, 811 A.2d 297, 304 (Md. 2002). The type of contractual provision most often cited as conflicting with the public policy embodied in the MWPCL is one that conditions the payment of a bonus or commission on the employee's continued employment at the time that the payment is to be made. See, e.g., Id. at 300 (invalidating contractual provision conditioning payment of incentive fees on the plaintiff being "employed at the time of the actual payment"); Rogers v. Sav. First Mortg., LLC, 362 F. Supp. 2d 624, 640-43 (D. Md. 2005) (finding unenforceable a provision that conditioned payment of year-end bonuses on continued employment six months after the end of the year in which the bonuses were earned).

6

Plaintiff asserts that, under the Compensation Program, his "commissions are expressly contingent on his continued employment with NVR," a condition which he characterizes as a "clear violation of the MWPCL."  ECF No. 48-2 at 13.  Taken out of context, some of the language of the Program would appear to provide support for that assertion.  The Program states,

> [T]he commission for the sale of a home is earned only when (1) settlement (closing) of that sale with the customer has been completed and (2) provided the SMR is employed by NVR, Inc. on that date.

ECF No. 48-3 at 1.  The Program further states,

> [i]f employment with NVR, Inc. ends for any reason, other than retirement or death, the SMR will not have earned or be entitled to any compensation on sales which have not completed settlement on or before the SMR's last day of employment.

Id. at 9.

The Program, however, also explains that the SMR must be employed through the time of settlement "because SMRs are not only required to obtain executed purchase agreements . . . but to also assist in making sure Customer Contracts procured by the SMR complete settlement (including, but not limited to performing the duties set forth below) and because NVR, Inc. is not paid until settlement."  Id. at 1.  The "duties set forth below" are quite extensive and include:

> (i) acting as a liaison between the customer and the company and the point of contact for the customer and

7

otherwise communicating with the customer to keep the customer informed of the status of home construction;

(ii) meeting with the customer and processing any amendments/addenda or other changes to the sales contract;

(iii) handling the selection process and meeting with the customer to select items such as cabinets, kitchen and bathroom fixtures, upgrades, options, etc.;

(iv) attending the pre-start, pre-drywall, and other meetings with the customer and the production team to, among other things, review all elements of the master sheet and site plan and to discuss the building/ construction process;

(v) being available during regular working hours to take calls and/or meet with the customer to address customer concerns, questions or requests for changes;

(vi) assisting in and monitoring the loan process, including assuring that the customer has, within 48 hours, called for an appointment with the lender, and following up with the customer and mortgage lender to assure the customer has and maintains financing allowing the customer to complete settlement;

(vii) keeping the company informed of customer status, including changes in financial conditions and/or any behavior or events that could impact on a customer's willingness and/or ability to make timely settlement on the customer's house;

(viii) monitoring the house construction process to make certain it is being built per the contract and customer selections, and providing assistance when required;

(ix) monitoring the customer's actions and/or inaction to make certain the customer is not in default of the home purchase contract with the company; and

(x) accompanying customers who visit homes under construction in his/her assigned community and ensuring that all safety procedures are followed.

Id. at 1-2.  An additional factor for requiring continued employment through settlement is identified as "the continuing costs to NVR, Inc. of administering sales including (but not limited to) compensation to other SMRs for assuming the duties of a departed SMR and servicing sales through settlement."  Id. at 1.

In moving for summary judgment, Defendant contends that its refusal to pay commissions on contracts that were not settled until after Plaintiff's voluntary resignation was based on Plaintiff's failure to complete all of the tasks necessary to earn those commissions and not on the simple fact that he was not employed as of the date of settlement.  Relying primarily on the Declaration of Plaintiff's immediate supervisor, Sales Manager Amy Stoianowski, ECF No. 40-1, Defendant identifies the tasks that it maintains were unfinished regarding the pending contracts and the efforts that had to be expended by others to complete those tasks.  Stoianowski explains that, because Defendant was closing its business in Easton, Defendant had no SMRs working in Easton when Plaintiff resigned.  Therefore, instead of assigning another SMR to the contracts that Plaintiff had initiated, she took over the accounts herself.  She states that bringing these contracts to settlement took up a "significant amount of [her] time and compromised [her] ability

to devote time and attention to [her] own duties as a Sales
Manager."  Stoianowski Decl. ¶ 18.

In similar circumstances, courts have found the refusal to
pay post-termination commissions or bonuses to be permissible
under the MWPCA.  In McLaughlin v. Murphy, 372 F. Supp. 2d 465
(D. Md. 2004), the plaintiff was a mortgage broker paid on a
strict commission basis.  His employment agreement specified
that,

> [i]t is understood that getting the loan to settlement
> is a major part of the Employee's role and that if the
> loan is not settled before the employee resigns, is
> terminated, laid off, dismissed, or any other action
> resulting in the Employee not working for the
> Employer, then the Employer will incur administrative
> costs and obligations.  Thus, the parties agree that
> the Employee shall not be entitled to receive
> compensation for loans not settled and funded prior to
> the termination of employment.

Id. at 472.  The plaintiff had signed up three customers for
mortgage loans that had yet to close at the time that he was
fired and he argued that, under the MWPCL, he was "entitled to
compensation for the work he did perform in prospecting and
developing the loans."  Id. at 473.

In denying his MWPCL claim, this Court noted that one of
the loans had yet to close at the time the decision was issued
and that the other two loans had to be completely redone because
the plaintiff had signed the customers up for loan programs for
which they did not qualify.  The plaintiff argued in support of

10

his claim that "the most difficult aspect of selling mortgage loans is obtaining clients" and "that placing someone into a new loan program because the original one was inappropriate is common and does not require much effort or expenditure." Id. Rejecting that argument, this Court held that,

> [t]he language of the contract [] demonstrates
> McLaughlin should not have expected to be paid for the
> work he performed prior to closing a loan, and that
> [the defendant] did not expect to compensate him for
> this work.  It does not matter that it might be more
> difficult to obtain clients than to close loans, or
> that placing someone in a new loan program is
> relatively simple.  The parties agreed when they
> signed the contract that McLaughlin would only be paid
> when he closed the loans, and he admits that he did
> not do so for the three loans in question.

Id.

This Court distinguished the case before it from the Maryland Court of Appeals' decision in Medex by observing that the employment contract at issue in McLaughlin did not condition payment of commissions on an arbitrary factor such as continued employment but, instead, on closing the loan.  "It is not contrary to public policy for [the defendant] to decide that commissions will only be paid for those loans that are fully settled," observing that closing a loan is a key element of the broker's job and brokerage fees from settled loans are likely crucial to the defendant's income.  Id. at 473-74.  The Court concluded that "the contract makes clear that his job was to prospect, develop, and settle loans completely, and that he

would be paid when those duties were performed.  Under the
MWPCL, only when [the plaintiff] completed all those tasks would
his right to any payment vest." Id. at 474.

Similarly, the Maryland Court of Special Appeals considered
the MWPCL claims of an "outside sales representative" for
commissions allegedly due on sales for which he generated
purchase orders while still employed but where the products were
not shipped and invoiced until after he left his employment.
Hoffeld v. Shepherd Elec. Co., Inc., 932 A.2d 1197 (Md. Ct.
Spec. App. 2007).  In affirming the trial court's rejection of
those claims, the Court of Special Appeals noted that "obtaining
purchase orders is not the lone service to be performed by an
outside salesman and there was more work to be done after a
purchase order was received."  Id. at 1208.  That additional
work included continuing to service the customer, processing
change orders, and resolving other post-purchase order problems.
On that basis, the court held that the defendant had "a
legitimate, non-pretextual business justification for
designating the shipping/invoice date as the point when a sale
is made and a commission is earned" and thus the commission plan
"was not against the public policy in the MWPCL." Id. at 1209-
10.  See also, Adams v. Wells Fargo Advisors, LLC, Civ. No. 12-
2130, 2014 WL 2124447, at *25-27 (D. Md. May 21, 2014)
(following McLaughlin and holding that incentives payable to a

12

financial advisor that were conditioned, not only on developing finance plans for clients, but also on servicing those clients for a period of nine years did not violate the MWPCL).

Plaintiff appears to have abandoned his claims related to four of the pending contracts as he makes no response in his opposition to Defendant's arguments directed at Counts I, VI, X, and XI.[3]  See Grant-Fletcher v. McMullen & Drury, P.A., 964 F. Supp. 2d 514, 525 (D. Md. 2013) (opining that the plaintiff appeared to have abandoned claims by not responding to arguments directed at those claims in the defendant's summary judgment motion).  Count VI relates to a contract signed by Paul Cunningham.  The Cunningham Contract never went to settlement, Stoianowski Decl. ¶ 27, and thus, Plaintiff has no basis on which to claim a commission, or to retain the $2,500 advance that he received on that contract.  Therefore, there is no

---

[3] Where the Amended Complaint references 11 contracts for which Plaintiff asserted he was entitled to commissions, in his Opposition he states that, when he resigned, "he had eight contracts which had not yet closed, but which did close after he left.  Plaintiff had done all, or substantially all, the necessary work for each account, and therefore, the full commission for these properties is due and owing to Plaintiff." ECF No. 48-2 at 2 (emphasis added).  In the portion of his Opposition captioned as "Material Facts in Dispute," however, he only addresses seven of the contracts, the Medved Contract (Count V), the Spiker Contract (Count II), the Blum Contract (Count IX), the Smith Contract (Count VIII), the Warner Contract (Count III), the Nichols Contract (Count VII), and the Trego Contract (Count IV).  Id. at 3-11.

dispute of fact as to this claim and Defendant is entitled
summary judgment on this claim.

Count X relates to a contract signed by David Lewis.
Plaintiff received an advance of $2500 on this sale but problems
arose with the loan and the contract was cancelled a few days
before Plaintiff's resignation.[4]  While that cancellation would
have required Plaintiff to return the advance, in the same month
as the cancellation of the Lewis Contract, another of
Plaintiff's contracts (the Webb Contract) went to closing
entitling Plaintiff to a $2500 commission.  The Webb Contract is
the subject of Count I of the Amended Complaint.  Defendant
simply offset the commission on the Webb Contract against the
requisite repayment of the advance on the Lewis Contract.  By
failing to address the Lewis Contract or the Webb Contract in
his opposition, Plaintiff concedes that he is owed no further
commissions associated with those transactions.

Count XI relates to a contract signed by James Kever.
Unlike the other sales contracts at issue, the Kever Contract
was for a home, not in Easton, but in Severn, Maryland.  Also
unlike the Easton contracts, the Kever Contract was turned over
to another SMR who worked with Mr. Kever for three months to

---

[4] A new employee picked up the attempted sale to Lewis and was
able to resolve the problems with the loan and a new contract
went to settlement about three months after Plaintiff's
resignation.  Jason Brant Decl., ECF No. 40-6, ¶ 5.

bring the contract to settlement and whose efforts included resolving several problems that he had with the home.  The new SMR was paid a commission on the sale.  Although Plaintiff questions why that SMR received only a $500 commission, as opposed to the $2000 that he represents that he would have received, he makes no other response in his opposition regarding this contract and the Court finds Defendant is entitled to summary judgment as to Count X.[5]

In arguing in his Opposition that he is entitled to commissions on the remaining contracts, Plaintiff asserts that he "performed all necessary functions to complete the sales at issue."  ECF No. 48-2 at 3.  To prove that assertion, Plaintiff both challenges Stoianowski's representations that she did any meaningful work to bring the contracts to settlement and also offers affidavits from five of the customers that signed contracts with Plaintiff – Jeff Medved, Matthew Spiker, Christopher Warner, Robert Nichols, and Thomas Trego.  ECF Nos. 48-4, 48-6, 48-7, 48-8, 48-9.  In those affidavits, the customers state generally that Plaintiff did all of the work on

---

[5] There appears to be some confusion as to the amount of the potential commission on this sale.  In its Motion, Defendant states that Plaintiff received a $2000 advance on this contract but had the potential to earn $5000 for this sale.  Stoianowski Decl. ¶ 26.  In his Opposition, Plaintiff opines that he would have received an additional $2000.  ECF No. 48-2 at 14. Regardless, it appears undisputed that Plaintiff received an advance of $2000 related to this contract.

their sales and that they do not remember work being done by any

other employee of Defendant.  Mr. Medved's affidavit is typical:

> Mr. Hammons helped me through the entire sales
> process.  I met with him on numerous occasions, he
> answered all my questions and was there for me as
> needed.  I was aware when Mr. Hammons left the
> company.  I cannot recall having any contact with Amy
> Zarewczynski[6] or any salesperson after his departure.
> I also do not recall any confusion or other issue with
> any of the fixtures in my house.  Likewise, I cannot
> recall any issue with my loan, or that my loan
> required modification.

ECF No. 48-4 (emphasis added).

Defendant challenges the submission of these affidavits on

several grounds.  First, Defendant notes that Plaintiff failed

to produce these affidavits in discovery and on that basis,

argues that they should be excluded.  See Fed. R. Civ. P.

37(c)(1) ("If a party fails to provide information or identify a

witness as required by Rule 26(a) or (e), the party is not allowed

to use that information or witness to supply evidence on a motion,

at a hearing, or at a trial, unless the failure was substantially

justified or is harmless.").  Second, Defendant correctly observes

that, even if not excluded, these affidavits do not create a

dispute of fact because they generally just reflect a lack of

recall on the part of the customer.  See Kennedy v. City of New

York, 570 F. App'x 83, 84 (2d Cir. 2014) (concluding that

deposition testimony which essentially claims a lack of

---

[6] Ms. Stoianowski was then known as Amy Zarewczynski.

recollection is not sufficient to raise a genuine dispute of fact).

Furthermore, the customer would not necessarily be aware of work

that Stoianowski was doing to bring the contract to settlement as

her tasks involved interaction with others besides just the

customer, including project managers, loan officers, and settlement

administrators.

The Court will not strike or exclude those affidavits[7] but

finds, nonetheless, that Plaintiff has failed to generate a genuine

dispute of material fact as to several of his claims as the

undisputed evidence demonstrates that Stoianowski had to perform

more than trivial tasks to bring the relevant contracts to

settlement.  As to the Medved Contract (Count V), settlement did

not occur until a month and a half after Plaintiff resigned.

Stoianowski Decl. ¶ 22.  In the interim, Stoianowski had to resolve

some confusion over fixtures in the basement powder room and also

met weekly with the loan officer to follow up on the loan.  Id.

Medved's testimony that he simply "does not recall" any issues with

the fixtures in his house or modification of his loan is

insufficient to create an issue of material fact.

Regarding the Smith Contract (Count VIII), the customer, Mary

Ann Smith, retired before going to settlement which resulted in her

loan needing to be rewritten and reevaluated by underwriting.  Id.

---

[7] The Court notes that, while challenging the submission of these
affidavits in its Reply, Defendant did not file an actual motion
to strike or exclude these affidavits.  As a result, Plaintiff
was not provided a clear opportunity to oppose their exclusion.

¶ 24.  Stoianowski states that she had daily conversations with the loan officer and weekly conversations with Ms. Smith and settlement was delayed about a month because of these issues.  Id.  The Smith Contract did not settle until July 30, 2012.

The Warner Contract (Count III) was scheduled to close on June 28, 2012, but the customer's loan was denied.  Id. ¶ 25.  After a month of effort and many conversations with the loan officer, Defendant was able to broker the loan to an outside lender.  Id. Mr. Warner acknowledges in his affidavit that he "did experience some complications with the approval of his loan, and ultimately received financing through another lender."  ECF No. 48-7.  His opinion that he "did not require the assistance of Mr. Hammons or another salesperson regarding this issue" and that he "cannot recall having any meaningful conversations with Amy [Stoianowski]" does not create a genuine issue of fact.  He may or may not have been aware of what efforts Stoianowski was making to resolve the problems with his loan.

Regarding the remaining four contracts – the Spiker Contract, the Blum Contract, the Nichols Contract, and the Trego Contract – the Court finds that Defendant has not met its burden to demonstrate its entitlement to summary judgment.  From the limited record before the Court, it is difficult to discern the true scope of the work that Stoianowski was called upon to perform regarding these loans.  As to the Spiker Contract, the loan closed on June 29, 2012, and the only work Stoianowski represents that she

18

performed was "keeping in contact with Mr. Spiker and providing the customer service necessary to bring the sale to settlement." Stoianowski Decl. ¶ 21.  In her deposition, Stoianowski acknowledged that the sale "went smoothly to closing," Stoianowski Dep. at 40, and when asked what customer service was necessary, she testified in only general terms about those tasks.  The only specific task identified regarding Mr. Spiker's contract was setting up a "pre-settlement demonstration," but she then testified that, in Mr. Spiker's case, she did not attend that meeting.  Id. at 41-42.

Regarding the Blum Contract which also went to settlement on June 29, 2012, the only specific task that she references was changing a backsplash that required two conversations with Mr. Blum.  Stoianowski Decl. ¶ 20.  In her deposition, Stoianowski clarified that it was not an issue of changing a backsplash, but that the backsplash was not initially installed so Defendant had to go back and install one.  Stoianowski Dep. at 62.  As to the Nichols Contract, which settled on June 27, 2012, the only specific task identified by Stoianowski besides "keeping in contact with Mr. Nichols" was preparing a title addendum.  Stoianowski Decl. ¶ 19. In her deposition, Stoianowski testified that preparing the addendum took 10 to 12 minutes to draft.  Stoianowski. Dep. at 35. Finally, as to the Trego Contract, Stoianowski simply states that her assumed duties were "keeping in contact with Mr. Trego and providing ongoing customer service."  Stoianowski Decl. ¶ 23.  From

her deposition testimony, it could be concluded that the customer service which she provided appears to have been a single telephone call in which she introduced herself.  Stoianowski Dep. at 49-50.

In Hoffeld, the Maryland Court of Special Appeals opined that, while not finding a violation of the MWPCL in the case before it, "an employee might establish such a violation in circumstances involving a bright line 'all or nothing' commission policy."  932 A.2d at 1209.  In Rogers v. Savings First Mortgage, LLC, supra, this Court found such a bright line rule to be unreasonable.  In Rogers, the defendant cited the difficulty of apportioning a commission between a terminated loan officer and the individual taking over the loan and seeing it through settlement as justification for a "'bright line rule,' i.e., that loan officers receive nothing at all unless they are employed at the time of closing, regardless of whether any work had to [be] done on the loan after their termination."  362 F. Supp. 2d at 643-44.  In finding that entry of summary judgment for the defendant was inappropriate on commissions denied under that bright line rule, this Court noted that,

> [a]lthough Plaintiffs admit that some additional work
> is often required on pending loans right up until the
> time of closing, it is unclear how substantial that
> work truly is for each of the different loans at issue
> here.  Certainly, it is unlikely if much or any
> additional work had to be done by others on loans that
> closed immediately after a Plaintiff was terminated. .
> . .  For those loans where no additional work was
> done, the relevant considerations are the same as
> those in Medex: compensation . . . is being linked to

the arbitrary factor of employment on a particular
date.[8]

Id. at 645.

The Court has the same uncertainty here regarding the Spiker,
Trego, Nichols, and Blum Contracts.  While that is not to say that
Defendant will not be able to establish that some further work was
required to bring these sales to settlement, on the current record,
the additional effort referenced appears to be so de minimis that,
drawing all inferences in Plaintiff's favor, the finder of fact
could conclude that the denial of the commissions for these sales
was simply the result of an impermissible "continuing employment"
requirement.  For this reason, the Court will deny Defendant's
motion as to these four counts (Counts II, IV, VII, and IX) at this
time.[9]

The Court finds that Defendant is entitled to summary judgment
as to Plaintiff's unjust enrichment claim.  Courts, both state and

---

[8] This Court noted in Rogers that there were certain untoward
practices at issue that created further doubt as to whether the
defendant was entitled to summary judgment.  Id. at 645.  There
do not appear to be any similar allegations here.  See, supra,
n.1.

[9] The Court notes that the Compensation Program itself at least
implicitly acknowledges the particular inequity of clawing back
the advance in situations where the SMR has completed the
majority of the work on a contract but leaves Defendant's
employment prior to settlement.  The Program allows for
Defendant "to elect to forgo collection of and forgive all or a
portion of outstanding Advances on Non-Settled Sales. . . ."
ECF No. 48-3 at 9.  This forgiveness, however, is conditioned on
the SMR signing a release at the time of termination/separation,
something Plaintiff obviously did not do.

federal, have consistently held that unjust enrichment claims are barred where there is a valid and enforceable contract governing the same subject matter as the unjust enrichment or quasi-contract claim. Cnty. Comm'rs of Caroline Cnty. v. J. Roland Dashield & Sons, Inc., 747 A.2d 600, 607-08 (Md. 2000) (collecting cases). "Generally, courts are hesitant to deviate from the principle of the rule and allow unjust enrichment claims only when there is evidence of fraud or bad faith, there has been a breach of contract or a mutual recission of the contract, when recission is warranted, or when the express contract does not fully address a subject matter." Id. at 608-09 (footnotes omitted).  Opposing Defendant's motion as to this count and relying on that just-quoted language, Plaintiff suggests that this rule can be circumvented because both sides are claiming that the contract was breached.  ECF No. 48-2 at 15.  Defendant notes that Plaintiff did not allege a breach of the contract in his Complaint or Amended Complaint, but raises the issue for the first time in his opposition.  Furthermore, the "breach of contract" exception to the rule is limited to situations where the alleged breach does not concern the same subject matter as the claim at issue. Janusz v. Gilliam, 947 A.2d 560, 568 (Md. 2008); Doll v. Ford Motor Co., 814 F. Supp. 2d 526, 551 (D. Md. 2011). Here, it clearly does. [10]

---

[10] By the same reasoning, Plaintiff would be entitled to summary judgment on Defendant's unjust enrichment counterclaim, although Plaintiff did not move for summary judgment.

Turning to Defendant's request for summary judgment in its favor as to its breach of contract counterclaim, the Court will grant the motion, but only as it relates to the contracts for which the Court will grant summary judgment on Plaintiff's claims.  The Compensation Program provides that "[a]dvances made to SMRs whose employment terminates before a corresponding sale has completed settlement" will be owed by the SMR to Defendant and, are "due, owing and payable to [Defendant] on the SMR's last day of employment."  ECF No. 48-3 at 2, 9.  Recognizing that in light of the MWPCL policy discussed above Plaintiff's right to retain the advances cannot be conditioned on his employment at the time of settlement, Defendant moves for summary judgment by arguing "Plaintiff did not complete all the duties required to bring those sales to settlement, and therefore failed to earn a commission on those sales."  ECF No. 40 at 26.  Except for the claims related to the Spiker, Blum, Nichols, and Trego Contracts, the Court would agree, for the reasons stated above, that Plaintiff did not perform all the work necessary to be entitled to retain the advances.

## IV. CONCLUSION

Accordingly, the Court will grant Defendant's motion for summary judgment as to Counts I, III, V, VI, VIII, X, XI, and XII but will deny the motion as to Counts II, IV, VII, and IX of the Amended Complaint.  The Court will grant Defendant's motion for summary judgment as to Defendant's Counterclaim for breach of contract as to the advances related to all but the Spiker, Blum,

Nichols, and Trego Contracts.  An order consistent with this

memorandum will issue.


_____/s/_____
William M. Nickerson
Senior United States District Judge


DATED: March 11, 2015